Michael Caspino
Michael J. Weiler
**PRICE CASPINO**
30442 Esperanza
Rancho Santa Margarita, CA 92688
(949) 899-9188
*Attorneys for Plaintiff Jagger Giles*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JAGGER GILES,**<br><br>       **Plaintiff,**<br>  vs.<br><br>**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,**<br><br>       **Defendant.** | Civil Action No. _____<br><br><br>**VERIFIED COMPLAINT AND DEMAND FOR TRIAL BY JURY** |

Plaintiff, Jagger Giles ("Jagger"), through his undersigned attorneys, by way of Verified Complaint against Defendant, National Collegiate Athletic Association (the "NCAA"), alleges:

### SUMMARY OF THE ACTION

1.     Plaintiff is and has been a student-athlete who has now been deemed ineligible to play football at the University of San Diego ("USD") for the upcoming 2025-26 season. Plaintiff brings this action for immediate and permanent injunctive relief, compensatory and punitive damages, and attorneys' fees and costs to enjoin and redress the NCAA's enforcement against Plaintiff, an athlete selected to join USD's football team, of an unlawful eligibility rule that would prevent him from competing for USD in violation of federal antitrust laws and similar cases across the country.

1

2.      The NCAA's eligibility rule at issue is unlawful because it has substantial anticompetitive effects on two-year or junior colleges and universities that are excluded from NCAA membership. The NCAA's Division I regulations limit student-athletes to four years of competition within a five-calendar-year span. This "Five-Year Rule", crucially, counts time spent at two-year or junior colleges. The result? It actively discourages and punishes student-athletes for attending junior college, even when these institutions offer essential academic and developmental opportunities. This rule not only deprives athletes of a beneficial junior-college path but also strips junior colleges of elite talent, diminishing their competitive standing against NCAA schools. The effect of the NCAA's anticompetitive conduct is evident as it relates to Jagger, an elite athlete who attended a junior college for two years to further his academic standing and prepare him to play NCAA Division I football.

3.      The NCAA's anti-competitive conduct will be to penalize Jagger for having attended a junior college unless enjoined by this Court. It will also permanently deprive him of the opportunity to enhance his career and reputation by playing another year of Division I football. The NCAA's anti-competitive conduct thus threatens him with immediate and irreparable harm.

4.      Because the NCAA's violation of federal antitrust laws is clear, Jagger seeks to enjoin the NCAA from enforcing the Five-Year rule as it applies to him while he pursues his antitrust claim in this action. Jagger is also seeking a temporary injunction now because USD's fall practices begin in July, 2025 and, absent immediate injunctive relief, he will be prevented from participating in that critical preparation for the 2025-26 season.

## THE PARTIES

5.      Jagger is an American citizen who was selected by USD to play as a member of its football team in the 2025-2026 season.

6.      The NCAA is an unincorporated association headquartered in Indianapolis, Indiana

2

that serves as the governing body of college sports. It is, therefore, a citizen of the State of Indiana.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over all claims at issue in this action pursuant to 28 U.S.C. §§ 1331 and 1367(a). The Court has federal-question jurisdiction over Jagger's claim for violations of the Sherman Act (Count One). The Court also has supplemental jurisdiction over Jagger's breach-of-contract claim because it is so interrelated with his Sherman Act claim as to form part of the same case or controversy.

8.     This Court has personal jurisdiction over the NCAA because it and its member institutions currently engage in continuous and systematic business in the Central District of California, including athletic competitions, ticket and merchandise sales, television agreements and other revenue-generating activities, and have directed many of the specific acts alleged in the Complaint to Plaintiff within this District.

9.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2)-(3) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District and because the NCAA is subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

### A. The Relevant NCAA Eligibility Rules And Their Discriminatory, Anticompetitive Effects On Junior Colleges.

10.     The NCAA is a voluntary, self-governing association of approximately 1,100 four-year colleges and universities that administers athletic competition for student-athletes.

11.     As the NCAA acknowledged in *NCAA v. Alston*, 594 U.S. 69, 90 (2021), its member schools collectively enjoy a monopoly in the market for student-athlete services, such that its restraints can and do harm competition. With such power, the NCAA has grown into what one court has described as a "financial behemoth," with "revenues often exceeding $1 billion annually." *Johnson v. NCAA*, 108 F.4th 163, 170 (3d Cir. 2024).

3

12.     Excluded from NCAA membership are two-year colleges ("Junior Colleges"), many of which are members of the National Junior College Athletic Association ("NJCAA"), an organization designed to promote, govern, and foster a competitive environment for two-year college athletics.  The NJCAA has no affiliation with the NCAA.

13.     The NCAA has three divisions: Division I, Division II, and Division III, each of which promulgates its own rules and operating guidelines.  These rules include those that determine the eligibility of student-athletes to participate in intercollegiate athletics.

14.     As a general matter, Division I teams are the most popular and attract the most money and the most talented athletes.

15.     Of relevance to this action are two eligibility rules codified in the Division I 2024-2025 Manual (the "Bylaws") that have the effect of discriminating against Junior Colleges by discouraging and penalizing student-athletes who attend them.

16.     The first is the Five-Year Rule.  This rule forbids a student-athlete from competing for a Division I school beyond the five-year period beginning when the student was first registered in a "collegiate institution."  More specifically, the Bylaws provide, in pertinent part:

> **12.8.1 Five-Year Rule.** A student-athlete shall complete the student-athlete's seasons of participation within five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution, with time spent in the armed services, on official religious missions or with recognized foreign aid services of the U.S. government being excepted. . . .
>
> **12.8.1.1 Determining the Start of the Five-Year Period.** For purposes of starting the count of time under the five-year rule, a student-athlete shall be considered registered at a collegiate institution . . . when the student-athlete initially registers in a regular term (semester or quarter) of an academic year for a minimum fulltime program of studies, as determined by the institution, and attends the student's first day of classes for that term.

17.     The second relevant rule of eligibility is the four-year limitation on intercollegiate

4

competition (the "Intercollegiate Competition Rule"). Under this rule, a student-athlete is forbidden from engaging "in more than four seasons of intercollegiate competition in any one sport." (Bylaws § 12.8.) Although Junior Colleges are excluded from Division I, the Bylaws define "intercollegiate competition" to include competition at either "a two-year or a four-year collegiate institution." (Bylaws § 12.02.6.)

18.    Notwithstanding these limitations, the NCAA maintains the discretion to waive application of the Five-Year and Intercollegiate Competition Rules to enable student-athletes to compete for NCAA member institutions.

19.    The NCAA has provided blanket waivers of the Five-Year and Intercollegiate Competition Rules to institutions in light of certain events. One such blanket waiver was granted to institutions due to the COVID-19 pandemic. This waiver permitted institutions to self-apply a waiver of the Five-Year and Intercollegiate Competition Rules for the 2020-2021 season.[4]

20.    The NCAA also granted institutions a blanket waiver of the Intercollegiate Competition Rule in the wake of the decision of the United States District Court for the Middle District of Tennessee on December 18, 2024, in *Pavia v. NCAA*, No. 3:24-cv-01336, 2024 U.S. Dist. LEXIS 228736 (M.D. Tenn. Dec. 18, 2024).

21.    In *Pavia*, the court granted Diego Pavia ("Pavia"), the quarterback for Vanderbilt University, a preliminary injunction prohibiting the NCAA from (a) counting a year that had Pavia spent playing football at a Junior College as a season of competition for purposes of the Intercollegiate Competition Rule; and thereby (b) barring Pavia, who had otherwise played just three years of Division I college football, from playing for Vanderbilt in the 2025-2026 season.

22.    The court found an injunction appropriate due to the clear anticompetitive effects the NCAA's interpretation of the Intercollegiate Competition Rule—*i.e.*, by counting Pavia's year of Junior College football as a season of competition—would have on Junior Colleges and student-

athletes:

> First, the challenged rules limit the NCAA Division I eligibility of student-athletes who attended junior college to two or three seasons while student-athletes who attend only NCAA Division I institutions have four years of Division I eligibility. This Rule gives a competitive advantage to NCAA Division I member schools over junior colleges—and thus the football players at each level—even though they are treated the same in terms of eligibility.
>
> The disparate treatment of these two groups also results in a distortion of the labor market for NCAA Division I football players by pushing student-athletes to attend NCAA member institutions so that they may enjoy a full four seasons of NCAA Division I eligibility even if junior college might otherwise be a better choice academically or athletically. Similarly, students who attend junior college for one year and are considering whether to continue their junior college education and obtain an associate degree or transfer to a NCAA Division I institution may be swayed in their decision by the prospect of relinquishing another year of NCAA eligibility and the accompanying competitive advantages and NIL compensation. The rule requiring forfeit of NCAA eligibility and associated NIL opportunities for junior college attendance discounts that choice.
>
> NCAA Division I member institutions compete directly with NJCAA schools for football talent. NCAA Division I offers a prospective football player significant advantages over junior college football—more exposure, potentially better competition and coaching, and financial advantages due to the NIL opportunities disproportionately offered to Division I athletes.
>
> In summary, the eligibility bylaws induce potential football players to attend NCAA institutions rather than non-NCAA institutions even when non-NCAA institutions, such as junior colleges, might be in their best interest. Therefore, the rule harms student athletes when they are making decisions on whether to attend a junior college or an NCAA institution.

*Pavia*, 2024 U.S. Dist. LEXIS 228736, at *22-23 (cleaned up).

23. The *Pavia* decision further found that the NCAA's interpretation of the Intercollegiate Competition Rule harmed consumers. In so ruling, the court reasoned that the "restriction on the eligibility of former junior college student-athletes to compete at the Division I level harms the competitiveness of the teams by limiting the number of years these players can

compete at the Division I level." *Pavia*, 2024 U.S. Dist. LEXIS 228736, at *24.

24.    Following the December 18, 2024 decision in *Pavia*, the NCAA provided a blanket waiver (the "*Pavia* Waiver") of the Intercollegiate Competition Rule to any student-athlete who (i) competed for a Junior College; (ii) would have been eligible to compete in the 2025-2026 season but for their time competing for a Junior College; and (iii) met all other eligibility criteria.

25.    But for the NCAA's interpretation and application of the Five-Year Rule to Jagger, he would qualify for the *Pavia* Waiver.

**B.  Jagger's Background And Collegiate Sporting Experience From 2019 Through The 2024-2025 Season.**

26.    Jagger is a talented and sought-after football player who plays the position of linebacker. The relevant details of his college football career are provided below.

27.    <u>2019-20 Season</u>.  Jagger enrolled full time at Cal State San Marcos for the 2019-2020 academic year with no athletic participation. He ultimately left Cal State San Marcos in the Spring semester due to the Covid-19 pandemic.

28.    <u>2020-2021 Season</u>.    During the 2020-21 season, Jagger did not participate in any athletic activities at any school.

29.    <u>2021-22 Season</u>. Following the conclusion of the 2020-2021 year, Jagger then attended Grossmont Community College, a junior college, where he played his first season of college football.

30.    <u>2022-23 Season</u>. Jagger continued his athletic career by playing his second season of college football at Grossmont Community College.

31.    <u>2023-24 Season</u>.    After playing two seasons a Grossmont Community College, Jagger accumulated enough interest from Division I schools which led to him transferring to Idaho State University ("Idaho State") where he played his third season of college football and first at the Division I level.

32.    <u>2024-25 Season</u>. While at UNLV, Jagger remained at this institution and played for Idaho State during the 2024-25 season, thereby using another season of competition for purposes of the NCAA's eligibility rules.

**C.    Jagger's Decision To Join USD, USD's Denial Of Jaggers's Request For A Waiver, And The Need For Immediate Injunctive Relief.**

33.    Following the completion of Idaho State's 2024-25 season, Jagger learned of the *Pavia* decision and believed it would enable him to play another season of Division I football.

34.    In light of this development, Jagger entered the transfer portal (the process and method by which student-athletes can transfer between schools)  to  play Division I football at a different school. He was then offered and accepted an opportunity to enroll at USD and play football for the Toreros in the Pioneer Football League. Jagger believed this opportunity was ideal for him academically and personally, as it would enable him to continue his football career and be close to his family, who live in the San Diego area.

35.    After transferring to USD, Jagger negotiated with several brands for NIL deals contingent on his ability to play for the Toreros in the upcoming season. Jagger is a San Diego native and multiple local brands have negotiated with Jagger for brand deals. The brand deals would have paid Jagger between $10,000 and $50,000, a substantial amount for a college athlete. In addition, Jagger previously sold apparel with his name, image, and likeness and plans on continuing to do so for the upcoming season. Naturally, that apparel will have substantially less interest if Jagger cannot play for the upcoming season.

36.    Shortly after arriving at USD, in June 2025, Jagger learned through USD's compliance department that he was ineligible to play the upcoming season due to the NCAA's Five-Year Rule.

37.    Jagger was ultimately told by USD compliance that they would not even request a waiver through the NCAA because it would surely be denied, as other athletes in similar

situations have shown.

38.     Given USD's refusal to request Jagger a waiver for the 2025-26 season, and the NCAA's strict granting of waivers, Jagger has filed this action to obtain injunctive relief from this Court. The need for such relief is urgent.

39.     USD begins fall practice for the 2025-26 football season on July 6, 2025. These fall practices are critical to both the team and Jagger, as they would facilitate his integration into the team's overall strategy and defensive play and enable Jagger to develop a rapport with the USD coaching staff and teammates. It is Jagger's understanding that if the NCAA does not grant him a waiver or he is not otherwise deemed eligible by the start of spring practice, USD will be forced to replace him on the roster with another player and he will lose his opportunity to play for USD next season.

**D.  Relevant Markets**

40.     As the court in *Pavia* found, the relevant market for purposes of this case is "the labor market for college football athletes in general and NCAA Division I football specifically." *Pavia*, 2024 U.S. Dist. LEXIS 228736, at *20.

41.     The United States is the relevant geographic market, and the NCAA and its member institutions are located in that geographic market.

42.     College athletes compete to earn spots on NCAA Division I athletic teams and NCAA member institutions compete with other institutions to attract and secure top-level college athletes.  NCAA member institutions secure college-athletes through the provision of various in- kind benefits, including full and partial scholarships, advanced academic programing, access to state-of-the-art training and rehabilitation facilities, and premier instruction from knowledgeable coaching staffs.

43.     Participating in NCAA Division I athletics provides significant benefits and opportunities to college athletes, including: (1) the ability to maximize their chances to play professional sports by providing extensive exposure to scouts; (2) the opportunity to compete

against the nation's best amateur athletes; (3) national publicity through nationwide broadcasting of sporting events; (4) full and partial scholarships; (5) the opportunity to earn personal sponsorship opportunities and marketing deals; (6) the ability to capitalize on NIL agreements, which sometimes provide millions of dollars in financial benefits; and (7) receipt of top-tier academic support through student-athlete assistance programs.

44.    The most talented student-athletes have no practical alternatives in the relevant markets to participating in NCAA Division I athletics.

45.    The NCAA has sole rule-making authority and maintains exclusive power over the promulgation of rules and regulations for its member institutions.

46.    Though the NCAA is a non-profit organization, its member institutions reap significant financial gains through the transactions they make with student-athletes. Member institutions reap revenue through hosting athletic events on their campuses, merchandise sales, television broadcasting contracts, and the generation of interest in their institutions. In return, the student-athletes receive the many benefits enumerated above.

47.    Accordingly, the transactions between member institutions and student-athletes are inherently commercial in nature and fall within the purview of the Sherman Act.

### E.  Anti-competitive Effects

48.    The NCAA enacts and enforces rules that it claims promote fairness and the well-being of student-athletes while preserving true athletic amateurism. These rules are adopted through the NCAA Division I Council and member institutions, effectively making the rules the practical equivalent of horizontal agreements among the NCAA and the member institutions who compete against one another for the labor of student-athletes.

49.    The NCAA's presumed refusal to grant Jagger the requested waivers, beyond being contrary to law, is wholly unfair to him, his teammates, and USD. The NCAA's conduct violates the Sherman Act because it has direct anticompetitive effects that harm junior colleges, college

athletes, and consumers of college athletics.

50.    Allowing the NCAA to apply the Five-Year Rule to encompass time spent at Junior Colleges would cause significant anticompetitive harm to Junior Colleges, Jagger, and similarly situated student-athletes participating in the labor market.  More specifically, as the court in *Pavia* found, enforcing NCAA rules that discourage or penalize student-athletes from attending Junior Colleges harm the Junior Colleges' ability to compete with Division I schools for talented athletes and limit the choice of educational institutions available to student-athletes.

51.    Further, consumers who attend NCAA athletic events or watch them on television or streaming services will also be negatively affected by the NCAA's arbitrary and unreasonable conduct.  It is reasonable to expect that fan interest in college athletics will dissipate if the governing body tasked with regulating and ensuring fair competition fails to do so.  The most talented prospective student-athletes may be deterred from attending Division I schools if they believe the NCAA does not promote fair competition and does not treat athletes fairly, especially with the growing availability of other professional sports opportunities in the United States and elsewhere.  Moreover, as the court found in *Pavia*, consumers of Division I intercollegiate events will be harmed because the level of competitiveness of Division I teams will be reduced due to the restrictions placed on elite athletes who attend Junior Colleges.

**F.  The NCAA's Rule Of Restitution.**

52.    Section 12.11.4.2 of the NCAA Bylaws—commonly known as the "Rule of Restitution"—provides as follows:

> **12.11.4.2 Restitution**.  If a student-athlete who is ineligible under the terms of the bylaws or other legislation of the Association is permitted to participate in intercollegiate competition contrary to such NCAA legislation but ***in accordance with the terms of a court restraining order or injunction*** operative against the institution attended by such student-athlete or against the Association, or both, and ***said injunction is voluntarily vacated, stayed or reversed or it is finally determined by the courts that injunctive relief is not or was not justified***, the Board of Directors may take any one or more of the following actions against

such institution in the interest of restitution and fairness to competing institutions:

(a)    Require that individual records and performances achieved during participation by such ineligible student-athlete shall be vacated or stricken;

(b)    Require that team records and performances achieved during participation by such ineligible student-athlete shall be vacated or stricken;

(c)    Require that team victories achieved during participation by such ineligible student-athlete shall be abrogated and the games or events forfeited to the opposing institutions;

(d)    Require that individual awards earned during participation by such ineligible student-athlete shall be returned to the Association, the sponsor or the competing institution supplying same;

(e)    Require that team awards earned during participation by such ineligible student-athlete shall be returned to the Association, the sponsor or the competing institution supplying same;

(f)    Determine that the institution is ineligible for one or more NCAA championships in the sports and in the seasons in which such ineligible student-athlete participated;

(g)    Determine that the institution is ineligible for invitational and postseason meets and tournaments in the sports and in the seasons in which such ineligible student-athlete participated;

(h)    Require that the institution shall remit to the NCAA the institution's share of television receipts (other than the portion shared with other conference members) for appearing on any live television series or program if such ineligible student-athlete participates in a contest selected for such telecast, or if the Board of Directors concludes that the institution would not have been selected for such telecast but for the participation of such ineligible student-athlete during the season of the telecast; any such funds thus remitted shall be devoted to the NCAA postgraduate scholarship program; and

(i)    Require that the institution that has been represented in an NCAA championship by such a student-athlete shall be assessed a financial penalty as determined by the Committee on Infractions.

53.    The Rule of Restitution allows the NCAA to punish a student-athlete and the

member school he or she attends (as well as the student-athlete's teammates) if the student-athlete

and the school rely on a court-issued temporary restraining order ("TRO") or preliminary injunction enjoining unlawful conduct by the NCAA and mandating that the student-athlete be permitted to participate in athletic competition if the TRO or injunction is later revoked for any reason.

54.    The clear purpose and effect of the Rule of Restitution is to discourage challenges to the NCAA's anticompetitive and improper rules and rulings by making it impossible for student-athletes and member schools to rely on validly entered court orders and to obtain meaningful injunctive relief.  Indeed, in light of the Rule of Restitution, colleges and universities typically do not permit a student-athlete to participate in athletic competition even if he or she obtains a TRO or preliminary injunction finding that an NCAA ruling is likely invalid and enjoining the NCAA from enforcing that unlawful restraint.

55.    As a result, courts, including this one, have enjoined the NCAA from enforcing the Rule of Restitution against student-athletes and their respective institutions who rely on a temporary restraining order or preliminary injunction when participating in intercollegiate athletics.  *See Williams v. NCAA*, No. 24-cv-614, 2024 U.S. Dist. LEXIS 18479, at *9 (D.N.J. Feb. 2, 2024); *Pavia*, 2024 U.S. Dist. LEXIS 228736, at *36; *Ohio v. NCAA*, 706 F. Supp. 3d 583, 601-02 (N.D.W.V. 2023).

56.    For the preliminary injunctive relief requested by Jagger to be effective, this Court must enjoin the NCAA from enforcing the Rule of Restitution for complying with an order granting that relief.

### G.  The Irreparable Harm To Jagger

57.    Jagger will suffer substantial irreparable harm if the Court does not grant the preliminary injunction with temporary restraints requested in this action, which would enable him to immediately join his USD teammates for fall training commencing on July 6, 2025, and continue his promising football career by competing for the Toreros in the 2025-26 season.

58.     By contrast, if the Court does not grant Jagger the requested injunctive relief, he will be unable to play for USD in its 2025-26 season.  He will thus be denied the opportunity those games present to gain the attention and acclaim that can only be obtained playing for a Division I football team. Missing out on these opportunities is the very definition of irreparable harm, as this Court recently recognized in *Williams v. NCAA*, 2024 U.S. Dist. LEXIS 18479, at *7-8 (D.N.J. Feb. 2, 2024).

59.     Unless he is assured that he will be eligible to play during the 2025-26 season, Jagger will also lose the opportunity to practice with the Toreros beginning July 6, 2025. These missed practices also would harm Jagger irreparably, as it would deprive him of critical and irreplaceable opportunities to become integrated into the Toreros' defense and the team as a whole. Further, if Jagger is not declared eligible to play in the 2025-26 season by the start of spring practice on July 6, 2025, USD could sign another player at his position (defensive back) through the transfer portal to fill his roster; in that event, Jagger will lose the opportunity to play Division I college football this coming season regardless of how his eligibility status is ultimately resolved.

60.     Despite the obvious and immediate harm that Jagger would suffer if not granted the requested waivers, the NCAA will not grant him a waiver of the Five-Year Rule (and thus also will not grant him the *Pavia* Waiver, which is dependent on the waiver of the Five-Year Rule). The NCAA has done so—confusingly and inconsistently—even though it granted the *Pavia* Waiver on a blanket basis for purposes of the Intercollegiate Competition Rule.  This Court's immediate intervention is needed to right this wrong.

### <u>COUNT ONE</u>
### (Violation of § 1 of the Sherman Act)

61.     Jagger repeats and realleges the allegations contained in Paragraphs 1 through 64 of this Complaint as though fully set forth herein.

62.     The NCAA, by and through its officers, directors, employees, agents or other representatives, has illegally restrained and suppressed competition in the relevant markets through its refusal to waive the Five-Year Rule as it applies to Jagger's semester attending a Junior College. The threat posed by the NCAA having license to bar student-athletes from realizing the opportunities they have earned without logical justification stifles the market's ability to flourish.

63.     As a direct result of the NCAA's denial of Jagger's waiver request, the NCAA will establish a precedent that it may unreasonably restrict student-athletes' ability to participate in the relevant labor market.

64.     The NCAA's position results in no benefits to competition in Division I collegiate athletics for the NCAA's member institutions, college athletes, or consumers of NCAA athletic contests. Indeed, the NCAA's position is logically inconsistent with its own decision to grant student-athletes a blanket waiver in these circumstances for purposes of the Intercollegiate Competition Rule.

65.     The NCAA's anticompetitive acts were intentionally directed at the United States market and have had a substantial and foreseeable effect on interstate commerce.

## COUNT TWO
### (Breach of Contract)

66.     Jagger repeats and realleges the allegations contained in Paragraphs 1 through 69 of this Complaint as though fully set forth herein.

67.     USD is a member of the NCAA Division I. As such, USD has agreed to submit to and abide by the NCAA's rules and regulations in exchange for the benefits of NCAA membership, such as participation in high-level intercollegiate athletic competitions. Furthermore, USD has agreed to subject itself to NCAA discipline for any failure to comply with its rules and regulations.

68.     Jagger, as a student-athlete enrolled at USD who is subject to the same NCAA

15

rules and regulations, is an intended third-party beneficiary of the contractual relationship between USD and the NCAA.

69.    The NCAA has a contractual obligation to Jagger, as an intended third-party beneficiary, to enforce its rules and regulations fairly, consistently and reasonably.

70.    As detailed above, the NCAA will not deem Jagger eligible for the 2025-26 Division I college football season based on its unreasonable and arbitrary application of the Five-Year Rule and its rule counting junior college competition as intercollegiate competition, even though the recent ruling in *Pavia* makes clear that this application violates the Sherman Act and is thus unlawful and invalid.

71.    The NCAA is treating the Five-Year Rule, when coupled with the rule counting junior college competition as intercollegiate competition, as valid and enforceable but the *Pavia* ruling makes clear that it is not.  As a result, the NCAA's insistence that the season Jagger spent playing football at a junior college counts as intercollegiate competition for purposes of the Five-Year Rule is directly contrary to its promise to enforce and adjudicate its rules fairly.

72.    By refusing to deem Jagger eligible for the 2025-26 Division I college football season based on the Five-Year Rule, the NCAA has breached its contractual obligations to him because there is no NCAA rule or regulation in existence that authorizes or permits those actions.

73.    As an intended third-party beneficiary of USD's agreement to be bound by the NCAA rules and regulations, Jagger has suffered and continues to suffer substantial and irreparable harm as a result the NCAA's denial of his eligibility to participate in athletics without any valid contractual authority.  To unjustly prevent Jagger from playing football during the 2025-26 season deprives him of the once-in-a-lifetime opportunity to compete in Division I football games, improve his skills, support his teammates, and showcase his talents to future professional employers.  Specifically, Plaintiff will be unable to compete in athletic competition

and avail himself of the myriad opportunities that emanate from his participation, including lucrative NIL rights.

**COUNT THREE**
**(Breach of the Implied Covenant of**
**Good Faith and Fair Dealing)**

74.    Jagger repeats and realleges the allegations contained in Paragraphs 1 through 77 of this Complaint as though fully set forth herein.

75.    There is a covenant of good faith and fair dealing implied in every contract, including the contract between the NCAA and USD to which Jagger is an intended third-party beneficiary. That covenant imposes on the parties an obligation to treat one another reasonably and fairly, and to not do anything to destroy or injure one another's right to receive the fruits of the contract.

76.    As detailed above, the NCAA has treated Jagger unreasonably and unfairly, and has destroyed and injured his contractual rights, by counting the season Jagger spent playing football at a junior college as intercollegiate competition for purposes of the Five- Year Rule and thereby deeming him ineligible to play in the 2025-2026 season. The NCAA has engaged in this conduct for the improper purpose and ill motive of enforcing its application of the Five-Year Rule, which the *Pavia* decision makes clear is a violation of the Sherman Act.

77.    The NCAA has, therefore, breached the implied covenant of good faith and fair dealing.

78.    As a direct and proximate result of the NCAA's breach of the implied covenant of good faith and fair dealing, Jagger has suffered and will continue to suffer significant damages.

**PRAYER FOR RELIEF**

WHEREFORE, Jagger respectfully requests Judgment in his favor and against the NCAA as follows:

17

A.    Declaring that (i) the NCAA's application of the Five-Year Rule to include time spent at Junior Colleges violates the Sherman Act; and (ii) Jagger is eligible to play for USD during the 2025-26 season;

B.    Preliminarily and permanently enjoining the NCAA to immediately grant Jagger's waiver request to enable him to compete for USD during the 2025-26 season;

C.    Preliminarily and permanently enjoining the NCAA from enforcing the Five-Year Rule to include time spent at Junior Colleges;

D.    Preliminarily and permanently enjoining the NCAA from enforcing the Rule of Restitution against Jagger and any institution, including USD, for which Jagger plays intercollegiate athletics for complying with and/or relying on any injunctive order entered by this Court; and

E.    Awarding Jagger compensatory and punitive damages, attorneys' fees and costs, prejudgment and post-judgment interest, and such other and further relief as the Court may deem equitable and just.

Dated: July 8, 2025
      Rancho Santa Margarita,
      California

PRICE CASPINO

By: _____
    Michael Caspino
    Michael J. Weiler
    30442 Esperanza
    Rancho Santa Margarita,
    California
    92688 (949) 899-9188
    *Attorneys for Plaintiff Jagger Giles*

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff, Jagger Giles,

hereby demands a trial by jury on all issues properly so triable.

Dated: July 8, 2025
      Rancho Santa Margarita,
      California

PRICE CASPINO

By: _____
     Michael Caspino
     Michael J. Weiler
     30442 Esperanza
     Rancho Santa Margarita,
     California
     92688 (949) 899-9188
     *Attorneys for Plaintiff Jagger Giles*

**<u>VERIFICATION</u>**

I, Jagger Giles, verify based on my personal knowledge that the facts set forth in the attached Verified Complaint are true and correct to the best of my knowledge, information, and belief.

I verify under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct.

Executed on July 7, 2025

JAGGER GILES